HARRY'S VILLAGE, INC., PLAINTIFF-APPELLANT, v. EGG HAR-
BOR TOWNSHIP, AND EGG HARBOR TOWNSHIP RENT RE-
VIEW BOARD, DEFENDANTS, AND FORTY EIGHT STATES
RESIDENTS ASSOCIATION, DEFENDANT-RESPONDENT.

Argued November 17, 1981—Decided June 7, 1982.

578

*Maurice Y. Cole, Jr.* argued the cause for appellant (*Cole and Cole*, attorneys; *Maurice Y. Cole* and *William P. Busch, Jr.* on the brief).

*David G. Sciarra* argued the cause for respondent (*Joseph P. Murray*, Director, Cape-Atlantic Legal Services, attorney).

*Jorge O. Aviles, Gregory G. Diebold* and *Maureen C. Schweitzer* submitted a brief on behalf of *amicus curiae* Legal Services of New Jersey (*Timothy K. Madden*, Director, Hudson County Legal Services, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

The issue in this case is whether a landlord, who has obtained a rent increase from a rent control board, must serve tenants with a notice to quit before the rent increase becomes effective. Resolution requires evaluation of the interrelationship between the common law, the anti-eviction act, *N.J.S.A.* 2A:18–53, 61.1 to –61.12, and a municipal rent control ordinance. We hold that, after receiving authorization from a municipal rent control board to increase rent, a landlord must nonetheless give a valid notice to quit for the rent increase to be effective.

I

The Egg Harbor Township rent control ordinance, enacted in 1977, permits landlords unilaterally to pass along at the end of a periodic tenancy any reasonable increases in property taxes and in costs of operations, maintenance and services. Tenants may contest the accuracy of those increases before the Board. Prior Board approval, however, is required before a landlord may increase rents because of capital improvements or hardship. A landlord may apply for a hardship surcharge when rents are insufficient to cover the costs of mortgage payments, taxes, operating expenses, other "special hardships," and a reasonable profit.

Under the ordinance, the landlord must notify each tenant of the time and place of the hearing. If the Board grants the landlord a capital improvement or hardship increase, it must notify the landlord in writing, and the landlord must "forthwith" serve each tenant with a copy of the Board's decision. A hardship surcharge is valid for one year, and a landlord must reapply to extend the surcharge.

Harry's Village, Inc. owns and operates in Egg Harbor Township a mobile home park known as Harry's Village No. 1, consisting of 226 trailer sites. After assuming ownership on November 2, 1977, Harry's Village made several capital improvements: it patched potholes, repaved streets, installed street lights and street signs, and dug two new wells.

Upon realizing that the rental income would not cover all its costs, Harry's Village applied on March 17, 1978 to the Egg Harbor Township Rent Review Board to require tenants to pay for their own heat, to increase rent to cover capital improvements and for a hardship surcharge. At all times the landlord and tenants association were represented by counsel.

The Board held a hearing on August 10, 1978 and granted certain relief to Harry's Village. In addition to requiring tenants to provide their own fuel, the Board set rents based on lot size: 40' × 60' lots—$85 monthly; 50' × 70' lots—$95 monthly; and 60' × 90' lots—$105 monthly.

Although dissatisfied with the amount of the increase, Harry's Village simultaneously notified the tenants of the Board's decision and filed an action in lieu of prerogative writ challenging the rent increase as inadequate and also challenging the ordinance as unconstitutional. During the pendency of the action, the tenants complied with the rent increase. Nonetheless, their attorney wrote Harry's Village that, in the future, tenants would not pay a rent increase unless it was preceded by a valid notice to quit as required by *N.J.S.A.* 2A:18–61.1 (Supp.1981–1982). While recognizing that the rent increases were inadequate, the trial court continued the increases and remanded the matter for a new hearing before the Board.

The Board conducted further hearings, and on April 10 it granted Harry's Village the right to charge the following rents effective May 1, 1979: 40' × 60' lot—$100; 50' × 70' lot—$110; and 60' × 90' lot—$115.

Once again Harry's Village challenged the decision before the trial court as arbitrary and capricious and alleged that the ordinance was unconstitutional. Furthermore, at a hearing on May 22, Harry's Village informed the Court that the tenants were not paying the rent increase granted by the Board. The defendants asserted that they had not been notified in writing of the Board's decision, as required by the ordinance, and that Harry's Village, despite their prior warning, had failed to serve them with a notice to quit. Harry's Village replied it could not comply with the ordinance because the Board had not issued a written opinion to be served on the tenants and that no notice to quit was necessary to effectuate the decision of the Board.

The court ordered the Board to issue immediately a written decision and reserved decision on the necessity of the notice to quit. The following day, May 23, 1979, the Board released its decision and on May 24 Harry's Village sent each tenant a copy of the decision and the following notice:

I hereby give you notice that the rent for lots as of May 1, 1979 at Harry's Village I Mobile Home Park, as fixed by the Egg Harbor Township Rent Review Board, is as follows:

40 × 60 ............. $100 per month
50 × 70 ............. $110 per month
60 × 90 ............. $115 per month

If you fail to pay the above rent for May and June prior to Wednesday, June 27, 1979, you are hereby notified to vacate and quit the premises now occupied by you no later than June 27, 1979 ....

On June 9, 1979 the court made its final decision, holding the rent control ordinance constitutional. Once again, however, the court found that the Board had acted arbitrarily. The tenants acquiesced in the landlord's request that the trial judge make findings and conclusions based on the second hearing before the Board. Accordingly, the court determined that the monthly rents should be: 40' × 60' lot—$103; 50' × 70' lot—$118; and

60' × 90' lot—$128. The court made the increase effective the same date as the Board's second decision, May 1, 1979. Also, the court ruled that a notice to quit was not required when a rent control ordinance provides tenants adequate notice of Board proceedings and rent increases. Immediately thereafter, Harry's Village amended its May 24 notice by personally serving on each tenant a copy of the court order increasing the rent retroactive to May 1. In addition, tenants received a copy of a letter reminding them, in accordance with the May 24 notice, that rent arrears were due immediately.

The tenants paid the increase under protest and appealed to the Appellate Division. In an unpublished opinion, the Appellate Division affirmed the decision of the Law Division, but ruled that a notice to quit was necessary before increasing rent. Furthermore, the Appellate Division found that the May 24 notice was not a valid notice to quit. Although the reason for that conclusion is unclear, the court apparently found the May 24 notice to be insufficient because it terminated the tenancies on June 27, not on their anniversary date, the first of the month. Presumably, the notice of the increase granted by the Law Division was deemed ineffective because the notice did not demand possession on a certain date. Having concluded that the notice to quit was invalid, the Appellate Division held that the rent increases awarded by the Law Division never became effective. We granted certification, 87 *N.J.* 370 (1981). We modify and affirm the judgment of the Appellate Division.

## II

The relationship of landlord and tenant, formerly the province of the common law, is now regulated also by legislation and sometimes by municipal ordinance. In the absence of a uniform state policy on rent control, a minority of municipalities has enacted rent control ordinances. The regulation of rent increases is a morass of uncoordinated responses by the courts, the Legislature and municipalities. Charting a certain course while

fairly balancing the interests of both landlords and tenants is a difficult, but critically important, task. Briefly stated, a fair balance must result in rents that are high enough to attract reasonable investors but not so high as to provide more than a fair return to those investors or to subject tenants to unfair rent increases. *Troy Hills Village v. Parsippany-Troy Hills Tp. Council*, 68 *N.J.* 604, 628 (1975).

Although the residents of Harry's Village do not have written leases, they pay their rent monthly. Accordingly, they are periodic month-to-month tenants. *Maier v. Champion*, 97 *N.J.L.* 493, 495 (E. & A. 1922); *Albey v. Weingart*, 71 *N.J.L.* 92, 93 (Sup.Ct.1904); *Steffens v. Earl*, 40 *N.J.L.* 128, 137–38 (Sup.Ct. 1878). A month-to-month tenancy is a continuing relationship that remains unabated at its original terms until terminated by one of the parties. *See Stamboulos v. McKee*, 134 *N.J.Super.* 567, 570–71 (App.Div.1975); *Skyline Gardens, Inc. v. McGarry*, 22 *N.J.Super.* 193, 196 (App.Div.1952). Either party may terminate a monthly tenancy by serving upon the other a month's notice to quit. *Steffens v. Earl, supra*, 40 *N.J.L.* at 134 (notice given by landlord on June 29 sufficient to terminate monthly tenancy on August 1); *S.D.G. v. Inventory Control Co.*, 178 *N.J.Super.* 411, 414–15 (App.Div.1981) (to terminate month-to-month tenancy, tenant must give one month's notice).

To increase the rent of a month-to-month tenant, the landlord must serve a notice to quit terminating the old tenancy and another notice offering a new tenancy at an increased rent. *See Stamboulos v. McKee, supra*, 134 *N.J.Super.* at 571; *Skyline Gardens Inc. v. McGarry, supra*, 22 *N.J.Super.* at 196. Absent a notice to quit, any attempt to increase the rent is ineffective and the tenancy continues at the old rental term. *Id.* When a landlord gives a proper notice to quit and a notice of rent increase, a tenant, by holding over, creates a new tenancy at the increased rental. *Stamboulos v. McKee, supra*, 134 *N.J.Super.* at 571.

In general, the notice to quit protects the interests of both landlord and tenant. The month's notice provides the landlord with time to find another tenant. *See S.D.G. v. Inventory Control Co., supra,* 178 *N.J.Super.* at 415–16. The notice also gives tenants a month to decide whether to accept changes in the rental terms or to seek alternative living arrangements. *See Stamboulos v. McKee, supra,* 134 *N.J.Super.* at 570. Thus, the notice assures tenants of time to consent to changes in their tenancy and protects them from arbitrary, unilateral changes imposed by landlords.

In a balanced housing market, where tenants and landlords enjoy equal bargaining power, the common law system would be fair. In a time of housing shortage, however, a tenant's bargaining power is impaired, giving rise to a potential for abuse. If no housing is available, a month's notice may not afford sufficient time to find alternative housing. Both the courts and the Legislature have recognized that the housing shortage has resulted in inequality in bargaining power between landlords and tenants. The courts have sought to equalize the position of the parties by implying reasonable terms into the lease. *Marini v. Ireland,* 56 *N.J.* 130, 143–44 (1970) (covenant of habitability implied into a lease to permit a tenant to deduct the cost of repairing a toilet from rent due a landlord). For its part, the Legislature has protected tenants by limiting the grounds on which landlords may dispossess them. *See, e.g., N.J.S.A.* 2A:18–61.1. Some municipalities, like Egg Harbor Township, have enacted rent control ordinances to protect tenants from unfair rent increases. In upholding rent control ordinances as a valid exercise of municipal police power, we have required that rent control boards permit landlords to receive a fair and reasonable return on their investments. *See, e.g., Helmsley v. Borough of Fort Lee,* 78 *N.J.* 200, 223 (1978); *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 569 (1975). The intent of these efforts by the Legislature, municipalities, and the courts has been to assure fairness in the landlord-tenant relationship.

Although a municipal rent control ordinance may require that tenants be notified of a request for a rent increase, an ordinance does not protect all the interests covered by the common law notice to quit. Notification pursuant to the ordinance merely informs tenants that a landlord believes he is entitled to an increase. Of necessity, the notice cannot inform tenants of the exact rent they will be required to pay if an increase is granted. In the absence of actual notice of the increase as approved by a municipal rent control board, tenants cannot determine if they can afford to pay the increased rent. Notice of a requested increase under a municipal rent control ordinance does not provide tenants with adequate notice to adjust their affairs after the increase is granted.

Consequently, we hold that a notice to quit is required to effect a rent increase in any periodic tenancy, including a tenancy in a rent-controlled municipality. Although we are not confronted with a dispossess action under *N.J.S.A.* 2A:18–61.1, our result is consistent with that statute, which requires service of a valid notice to quit and notice of increase of rent as a condition precedent to removal of a tenant. A rent control board may authorize a rent increase, but a landlord must still comply with requirements of state statutory and common law, which include service of a valid notice to quit and notice of rent increase before imposing an increased rent on tenants. Therefore, we agree with the Appellate Division to the extent that it required a notice to quit before Harry's Village could implement its rent increases. Nonetheless, we disagree with the finding of the Appellate Division that Harry's Village had never served a valid notice to quit.

At common law, a full month's notice was required to terminate a monthly tenancy. *Steffens v. Earl, supra,* 40 *N.J.L.* at 134. In addition to stating the reason for termination, a notice to quit should inform the tenant that the parties are landlord and tenant, the premises are to be vacated on a certain date, and the right to possession terminates on that date. *See*

*Dector v. Phelps,* 136 *N.J.L.* 53, 55 (Sup.Ct.1947). The traditional common law rule has been that a notice to quit must terminate the tenancy precisely on the anniversary date. *Hanks v. Workmaster,* 75 *N.J.L.* 73, 74 (Sup.Ct.1907); *Baker v. Kenny,* 69 *N.J.L.* 180, 182 (Sup.Ct.1903) (one month's notice to quit on anniversary date that is served on corresponding date in the preceding month is adequate); *Waters v. Williamson,* 59 *N.J.L.* 337, 339 (Sup.Ct.1896); *Finklestein v. Herson,* 55 *N.J.L.* 217, 218 (Sup.Ct.1893); *Steffens v. Earl, supra,* 40 *N.J.L.* at 135; *McGeary v. Hyde,* 3 *N.J.Misc.* 115, 116 (Sup.Ct.1925). Those cases demonstrate the common law's penchant for formalism and procedural precision. At times, however, that predilection may undermine the very policies the common law sought to protect. Some courts and scholars recognize that termination only on the anniversary date may not further the policy underlying the notice to quit. That policy, the provision of sufficient time for the parties to adjust their affairs, may be protected adequately by permitting a notice to quit to be effective on the next ensuing anniversary date of the tenancy. *See, e.g., T. W. I. W., Inc. v. Rhudy,* 96 *N.M.* 354, 357–358, 630 *P.2d* 753, 756–57 (1981) (notice to quit on date other than anniversary date effective on next ensuing anniversary date); *Kester v. Disan Engineering Corp.,* 591 *P.2d* 344, 348 (Okla.Ct.App.1979) (same); *Restatement (Second) Property* (Landlord and Tenant) § 1.5 Comment f & Illustration 6 (1977).

The Appellate Division recently adopted this principle in an analogous situation in which a tenant sought to terminate a commercial tenancy. *S. D. G. v. Inventory Control Co.,* 178 *N.J.Super.* 411 (1981). In *S. D. G.,* the tenant advised the landlord on November 16 of its intention to quit on November 30. *Id.* at 414. Although the notice was ineffective to terminate the tenancy on November 30, the Appellate Division determined that it became effective on December 31, the end of the next period of the tenancy. *Id.* In reaching that conclusion, the Appellate Division noted that the rule adequately protected the landlord's interest in securing a new tenant. *Id.* at 415–16.

Here, the Appellate Division apparently viewed the May 24 notice as invalid because it demanded possession on June 27, instead of the anniversary date of the tenancies, July 1, 1979. In this case, the active participation of the tenants association, represented at all times by counsel, renders overly protective the common law requirement that a notice to quit must state that the tenant quit the premises on the precise renewal date. We conclude that, where a landlord has substantially complied with the requirements of a notice to quit and inadvertently failed to give notice on the precise anniversary date, a notice to quit may be effective on the next anniversary date after receipt of the notice. Although the next ensuing anniversary date is more than one rental period later, that result is both fair and reasonable. The notice informs the tenant that the landlord wishes him to vacate the premises and provides the tenant with more than one rental period to find alternative housing. For example, in a month-to-month tenancy beginning on the first of the month, if the notice to quit is given on May 15, one month could not elapse before June 1, and the tenancy will terminate on July 1. *See T. W. I. W., Inc. v. Rhudy, supra*, 96 *N.M.* at 357–358, 630 *P.2d* at 756–757; *Kester v. Disan Engineering Corp.*, 591 *P.2d* at 348.

Applying that principle to the facts of this case, the notice given by Harry's Village on May 24 to its tenants demanded possession on June 27. The next ensuing anniversary date 30 days after receipt of the notice was July 1. Accordingly, the rent increase granted by the Board became effective on that date.

This case raises the further question of whether the trial court order imposed an invalid retroactive rent increase. On June 9, 1979 that court modified the Board's ruling and granted Harry's Village an additional rent increase effective May 1, the date on which the Board had stated its rate increase should take effect.

In reaching that conclusion, the trial court found that the decision of the Board was unsupported by substantial credible

evidence and was arbitrary, capricious and unreasonable. Viewing a remand as unwise in light of protracted proceedings, the trial court undertook to set the rents, a procedure in which the tenants acquiesced. We are satisfied that the trial court properly exercised its discretion in overturning the Board decision and determining the appropriate rents. *See Henry v. Rahway State Prison*, 81 *N.J.* 571, 580 (1980); *Green Acres of Verona, Inc. v. Borough of Verona*, 146 *N.J.Super.* 468, 470 (App.Div.1977); *Maple Hill Farms, Inc. v. Division of N.J. Real Estate Comm.*, 67 *N.J.Super.* 223, 226 (App.Div.1961). In this proceeding, the tenants do not challenge the amount by which the trial court increased the rents. Rather, the tenants question the effective date of that increase. They seek, in effect, a rent rebate because of failure to notify them in precise conformity with common law requirements.

Pursuant to the June 9 trial court order, Harry's Village undertook on June 10 to modify its May 24 notice to quit to reflect these further increases. Less than a month expired, however, before July 1 so that the tenants did not have a full month to decide to accept the rent as increased by the Law Division. *See PMS Realty Co. v. Guarino*, 126 *N.J.Super.* 134, 137 (Essex County Ct. 1973). Ordinarily, the rent as increased by the court could not have become effective until the next ensuing anniversary date, August 1, 1979. Under the unique facts of this case, however, we conclude that the court ordered increase should become effective on July 1, 1979.

By remaining in possession after receiving a valid notice to quit and a notice of rent increase, a tenant impliedly consents to the increase. *See Stamboulos v. McKee, supra*, 134 *N.J.Super.* at 570–71. Following the Board's written opinion of May 23, Harry's Village sent on May 24, 1979 a notice of the rent increase to each tenant. Because of the inadequacy of that increase, the Law Division subsequently increased the rent. Under the special circumstances of this case, we hold that the tenants remaining in Harry's Village on August 1, 1979 implied-

ly accepted the decision of the Board as modified by the trial court. Consequently, on August 1, those tenants became liable prospectively for the new rent and liable for the arrearages for July.

In his concurring and dissenting opinion, Justice Pashman adopts the rationale of the majority opinion without taking cognizance of the undue delay in this case in determining adequate rents. Because the Board could not bring itself to grant the landlord an adequate rent increase, the trial court was obliged to determine the appropriate rents, a procedure in which the tenants acquiesced. Until directed by the trial court, the Board did not even comply with its own ordinance requiring it to prepare a written opinion. Consequently, Harry's Village could not comply with the requirement of the ordinance that it serve each tenant with a copy of the Board's written determination. Through no fault of its own, Harry's Village could not implement until July 1, 1979 the inadequate rent increase awarded by the Board. Under these circumstances, it would be inequitable to delay further the implementation of the rents as determined by the trial court.

Over four years have elapsed since the landlord applied to the Board for a rent increase, and the tenants have paid the increase during the last three years. Under the peculiar facts of this case, the import of the dissent would be not to give tenants enough time to save money to pay a future rent increase or even to pay additional sums for a past tenancy. The tenants paid the additional rent three years ago. In this unusual instance, where a local rent control agency prevented the landlord from receiving a reasonable rent increase, we believe the more equitable result is to declare July 1, 1979 to be the effective date for the rent increase.

We recognize that retroactive rent increases present formidible practical problems. Tenants may move and be unavailable to the landlord for payment of retroactive rent increases. Those who have paid their rent have a right to be secure from a

subsequent surcharge. Often, because of lack of notice, a retroactive rent increase could work a hardship on tenants. In this case, however, the tenants were not surprised by a subsequent notice that previously paid rents were insufficient. The tenants association, which was represented by counsel before the Board and in court, knew on April 10, 1979 that a rent increase had been authorized. Furthermore, on May 24 each tenant received a notice of rent increase.

We agree with the determination of the Appellate Division, except to the extent that it found that Harry's Village never served the tenants with a valid notice to quit and notice of rent increase. To that extent, we modify the judgment of the Appellate Division and hold that tenants who remained in possession after receipt of the notice to quit and notice of rent increase are liable for increased rents as of July 1, 1979, the first monthly rental period to begin more than thirty days after receipt of the notices. Those tenants who remained in possession on August 1, 1979 are also liable as of July 1 for the additional rent increase granted by the trial court.

PASHMAN, J., concurring in part and dissenting in part.

I concur in the majority opinion of Justice Pollock except insofar as it applies the second rent increase retroactively. To this extent, the Court has misapplied the law governing the relations of landlords and tenants in New Jersey. Moreover, the Court presents no justification for this result. On this narrow issue, I therefore dissent.

The majority properly concludes that when a rent control board or a court grants a rent increase pursuant to a rent control ordinance, the rent increase may not take effect until the landlord has given the tenants a valid notice to quit and notice of the rent increase. *Ante* at 585–586, 588. Month-to-month tenants have the legal right to at least one month's notice either to accept a new tenancy at the increased rate or to move out of the premises. Tenants who stay on the

premises after the beginning of the new tenancy are prospectively liable for the new rent after that date. *Ante* at 588–589.

The Egg Harbor Rent Review Board granted the landlord a rent increase on April 10, 1979, effective May 1, 1979. However, the Board had no power to make such an increase effective on May 1 since one month's notice is required. The increase cannot become effective until the landlord notifies the tenants individually of the increase. The landlord did not notify the tenants of the rent increase until May 24. That notice informed the tenants that if they did not pay the rent increase effective May 1, they must vacate by June 27. In effect, the landlord informed the tenants at the end of May that they had not paid enough rent for that month. Like the majority, I find that this increase did not become effective until July 1, *ante* at 587, after the tenants had a month to decide whether to accept a new tenancy at the increased rent or move out.

The trial court granted a second increase on June 9 to be applied retroactively to May 1. The landlord notified the tenants of this second rent increase on June 10. Thus, the tenants were notified in the middle of June that they had not paid enough rent for May and June. Like the majority, I find that this increase could not become effective until August 1, 1979. *Ante* at 588. Unlike the majority, I would not find the tenants who stayed after August 1 liable for this second increase for the month of July.

Although the majority properly holds that the tenants are liable for the first rent increase from the date on which it became effective, July 1, it applies a different rule to the second increase granted by the trial court. Rather than hold the tenants liable for the second increase from August 1 onward, the majority holds the tenants who remained after August 1 liable for this second increase for the month of July, the month preceding the effective date of the increase. I find no reason to apply a different rule when a rent increase is granted by a court

than when it is granted by a Rent Review Board. Tenants should be liable for an increase only after they have received the required notice. I would therefore hold that those tenants who stayed after August 1 are not liable for the second increase until that date.[1]

The majority properly cites *Stamboulos v. McKee*, 134 *N.J.Super.* 567 (App.Div.1975), for the proposition that a tenant who remains in possession after receiving a notice to quit and a notice of rent increase is obligated to pay the higher rent beginning the date on which the increase becomes effective. *Ante* at 588–589. However, neither that decision nor any other has required tenants to pay the higher rent for months preceding the date on which the new tenancy commenced. On the contrary, the law in New Jersey has been that month-to-month tenants are entitled to one month's notice before a new tenancy can be created at an increased rental. *Id.* at 570–71; *Bhar Realty Corp. v. Becker*, 49 *N.J.Super.* 585, 590 (App.Div.1958); *Skyline Gardens, Inc. v. McGarry*, 22 *N.J.Super.* 193, 196 (App. Div.1952).

A tenancy is a contractual relationship between landlord and tenant. *Bhar Realty Corp. v. Becker*, 49 *N.J.Super.* at 590. It continues until it is terminated by one party or the other. *Stamboulos v. McKee*, 134 *N.J.Super.* at 570–71. As the majority notes, the notice to quit terminates the old tenancy. The purpose of the notice of rent increase is to offer the tenant a new tenancy at an increased rent when the old tenancy ends. *Ante* at 584. There is no authority for the proposition that the landlord is free retroactively to change the terms of the old tenancy. In fact, the Appellate Division held in *Stamboulos v. McKee, supra*:

---

[1]The one month notice period is an important protection for tenants. Thus, even though the second increase is quite small, I feel compelled to discuss the existing legal rules in some detail. In its efforts to simplify the case and achieve a compromise, the majority failed to apply the existing law properly.

[A] month-to-month tenancy is a continuing tenancy, which does not give rise to a new relationship for each month. Even under the law as it existed prior to this statute, *a new tenancy was established only when the existing monthly tenancy was actually ended and the new one commenced.* Thus, where the landlord gave a proper notice to quit and demand for possession at the end of the month, unless the tenant paid an increased rental commencing the beginning of the following month, the holding over of the tenant created a new tenancy at the increased rental. [134 *N.J.Super.* at 570–71 (emphasis added)]

The purpose of the month's notice is not only to give tenants time to decide whether to accept the terms of the new tenancy or to move. It is also to give them a chance to begin saving enough money to pay the increased rent. We can take judicial notice of the fact that rent consumes a substantial portion of most tenants' income. In many cases, tenants require a certain amount of notice to arrange their financial affairs so that they can budget enough money to accommodate the increased housing costs. The notice requirement allows tenants to plan the amount of their income they must allocate to housing by giving them prior notice of any changes in the terms of their contract with the landlord.

Allowing rent increases to be awarded prior to the effective date of the new tenancy would frustrate the notice requirement. Tenants cannot easily avoid the increased rental by simply moving. In practice, most tenants would probably stay where they are. The result would be that tenants could never be sure that they had paid enough rent for any particular month since they might later get notice that in past months they had not been paying enough rent.

I find no justification for departing from the established rule when an increase is granted by a court rather than a Rent Review Board. Tenants should be secure in the knowledge that once they have paid the contractual rent for a certain month, their legal obligations have been satisfied. Before their rent can be increased, they will have at least one month's notice. Landlords should not be allowed to notify tenants that they owe more rent for last month than they thought they owed. It is small consolation to tenants that they can avoid the retroactive

increase by leaving their homes. The tightness of the rental housing market coupled with the high cost and burden of moving render it a notably unattractive alternative. These difficulties are exacerbated for low income tenants who will also be hurt the most by retroactive rent increases.

The majority expressly limits its holding to "the peculiar facts of this case." *Ante* at 589. However, the reasons given for departing from the established rule are singularly unpersuasive. The majority notes that the tenants acquiesced in allowing the trial court to determine the appropriate rents. While it may be true that the tenants were content to have the appropriate rents determined by a court rather than the Rent Review Board, there is no evidence that the tenants agreed to retroactive increases.

The majority further argues that the tenants "were not surprised by a subsequent notice that previously paid rents were insufficient," *Ante* at 589, because the tenants association was represented by counsel before the Board. This reasoning contradicts the entire basis for the majority's opinion. The majority holds today that the law requires the landlord to give *individual* notice of a rent increase to each tenant. None of the tenants had advance warning that the trial court would grant a second increase. By holding the tenants liable for the court's June 9 increase as of July 1, one month before its effective date, the majority has decided today that one-month notice is required to raise the rent—in all cases except this one.

The only remaining argument for not applying the usual rule to this situation is that the tenants have already paid the money. There is therefore no problem of surprise or need to give the tenants time to save money to make future rent payments. I find this argument the weakest of all. The effect of such a rule would be to allow landlords to evade the one-month notice requirement whenever their tenants are unaware of their legal right to the one-month notice. I do not think this Court should support a result that decreases the incentive for landlords to obey the law.

I would hold that the rent increases became effective on the dates when the new tenancies were created. I agree with the majority that the increase granted by the Board became effective July 1. The tenants who remained in Harry's Village after July 1 are liable for that increase beginning in the month of July. The second increase, granted by the trial court, became effective August 1. The tenants who stayed after August 1 are liable for that increase from August onward. Because the majority holds otherwise, I dissent.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*Concurring in part and dissenting in part*—Justice PASHMAN—1.