LASSER, P.J.T.C.
In this action taxpayer contests the 1985 local property tax assessment on its property in Randolph Township, Morris County, New Jersey, located at the intersection of Center Grove and Quaker Church Roads and known as Block 77, Lot 32 (formerly Block 51, Lot 18). The property consists of an irregularly-shaped parcel of land containing approximately 16 acres, upon which is constructed a well-maintained, 214-unit garden apartment complex. The brick and frame two-story buildings built in 1966-1967 contain 94 three and one-half room apartments, 100 four-room apartments and 20 four and one-half room apartments. There are paved parking areas and an outdoor pool. Gas for heating and cooking is furnished to the tenants. Electricity is separately metered and paid by each tenant.
In 1982 all real property in the taxing district was revalued. A contest of the 1982 assessment resulted in a settlement reducing the assessment. In July 1983 Randolph Township amended its rent control ordinance to adopt vacancy decontrol. Vacated units, when decontrolled, are subject to no future rent *267 limitation. The assessor concluded that decontrol of rents and the consequent rent increases changed the value of the property, so for the 1985 tax year he increased the assessment over the prior year’s assessment. The 1982 reduced assessment pursuant to the settlement and the 1985 assessment are as follows:
1982 Reduced Assessment
_per Settlement_ 1985 Assessment
Land $ 742,000 $ 742,000
Improvements 2,581,800 3,752,000
Total $3,273,800 $4,494,000
The Randolph Township 1985 tax rate is $2.81, and the average ratio and common level range promulgated by the Director of the Division of Taxation for the township for 1985 are:
Average ratio— 94.94%
Common level range
Upper Limit— 109.18%
Lower Limit— 80.70%
The principal issues in this case are the proper valuation of a multi-family residential property undergoing rent decontrol and whether discrimination relief is to be granted to a taxpayer whose assessment is substantially increased subsequent to a municipal-wide revaluation.
Taxpayer contends that the gross rentals to be used in the income approach to value are the actual rents on the October 1, 1984 assessing date, even though some apartments are rent controlled, some are free from rent control and rents for apartments of the same size and type vary. Taxpayer also contends that when there is a substantial reassessment of an individual property in a non-revaluation year, the taxpayer is entitled to have its assessment reduced to the common level of assessment in the taxing district even if the assessment being contested is within the 15% corridor allowed by chapter 123 of the Laws of 1973. N.J.S.A. 54:51A-6.
*268 The assessor testified that after analyzing the four garden apartment properties in the township, as well as other income-producing properties, he increased the assessment on the subject property because of the effect of rent decontrol. He made no adjustment in the assessments of any one-family residential properties. Taxpayer concedes that the assessor has the right to change the assessment of the subject property if its value changes.
A summary of the income approach valuations of the appraisal experts and the court’s conclusion of value by the income approach follow:
Taxpayer Taxing District Tax Court
Gross rental income $1,146,180* $1,200,000 $1,146,180
Laundry income 8,400 8,000 8,400
Miscellaneous income 1,500 1,500
Less vacancy & collection loss 34,380 (3%) 12,080 (1%) 11,460 (1%)
Effective gross income 1,121,700 1,195,920 1,144,620
Expenses
Insurance 18,349 $ 50,000
Fuel 120,295 115,000
Water 12,056 12,500
Sewer 20,246 20,246
Electric & gas 27,131 28,000
Garbage removal 8,158 8,500
Salaries & wages 69,575 75.000
Benefits 2,000 2,000**
Payroll taxes 9,000 9,000
Maintenance & repairs 100,000 54,200
Painting 18,340 10.000
Reserve for replacements 17,920 12,000***
Management 56,000 60,000
Professional fees & miscellaneous 7,500 5,000****
$ 486,570 $ 461,446 $ 486,570
Net income $ 635,130 $ 734,474 $ 658,050
Capitalized at .1532 .1416 .1417*
Property value $4,145,800 $5,186,963 $4,643,966
Rounded $4,150,000 $5,200,000 $4,644,000
*269 * The 10/1/84 rent roll of $95,515 annualized
** Employee insurance
*** Reserves and appliances
**** Includes advertising and telephone
***** .115 + .0267 = .1417
The appraisal experts for taxpayer and the taxing district relied primarily on the income approach, although the expert for the taxing district also valued the property by the cost and market approaches. Taxpayer’s appraisal expert used the actual rent roll on October 1, 1984, the assessing date, annualized it and deducted a 3% vacancy factor because the October rents, he contended, were near a high point in the year and, therefore, were higher than the actual rents collected during calendar year 1984.
The appraisal expert for the taxing district ascribed economic rents to each class of apartment based on the highest decontrolled rental that he believed could be obtained for that class, although most October 1, 1984 rents were lower. The expert conceded that his gross rental income might be slightly on the high side, but it was his opinion that the actual rents were slightly on the low side. The taxing district’s expert allowed only a 1% vacancy factor because the apartments were fully rented and there was a waiting list.
The total operating expense figures used by the experts were similar, with taxpayer’s expert being higher on some items and the taxing district’s expert higher on others. The principal difference was in the maintenance and repairs figure. The taxing district’s repairs and maintenance items totaled $54,200 ($20,000 general repairs, $10,000 snow removal, $1,200 pest control, $7,500 gardening, $3,000 pool maintenance, $10,000 supplies and $2,500 cleaning). The taxing district’s expert reduced the $100,000 actual repairs and maintenance figure submitted by taxpayer because, he contended, much of this work was done by salaried employees of the apartment com *270 plex. However, his proof on this point was not persuasive, and I will accept taxpayer’s repairs and maintenance figure, which is consistent with the actual repairs and maintenance expenses incurred over a four-year period.
In their income approach, the experts for taxpayer and the taxing district did not separately value the land but used an overall capitalization rate to find the combined value of the land and improvements. Taxpayer’s expert’s capitalization rate was arrived at on a mortgage equity basis. It was the expert’s opinion that, as of the assessing date, 13% was the mortgage interest rate required by lenders who would lend 75% of value, and 10% was the equity return required by investors on the remaining 25% of value. He contended that the 10% rate took into consideration not only the return on equity but also prospective value appreciation and the tax benefits. Taxpayer’s expert conceded that the income produced from this property is largely sheltered from federal income taxation. Using a mortgage interest and amortization constant rate of 13.53% and the actual tax rate of $2.81 reduced by the 94.94% common level ratio, taxpayer’s capitalization rate calculation is as follows:
75% of 13.53% = 10.15%
25% of 10.00% = 2,50%
12.65%
Effective tax rate 2,67%[1]
Capitalization rate 15.32%
The taxing district’s expert relied in part on an overall capitalization rate for land and improvements of 11% derived from a June 1985 garden apartment house sale and, tó a lesser extent, the American Council for Life Insurance Companies (insurance council) analysis of capitalization rates for the third quarter of 1984 to support his opinion that the overall capitalization rate for land and improvements is 11.5%. He added a tax factor of 2.66%, for a total capitalization rate of 14.16%.
*271 Taxpayer contended that the taxing district’s capitalization rate should be disallowed by the court because it is based on a sale that occurred after the October 1, 1984 assessing date, and taxpayer claimed that this sale could only be used as corroboration.
In 1983-1984, 83 of the subject 214 apartments were decontrolled, and an additional 26 were decontrolled in 1985. There is no proof concerning the nature of the tenancies of apartments that continue under rent control or of the expected time period to obtain full decontrol, taking into consideration the anti-eviction laws.
Under the rent control ordinance the landlord is entitled to a 6% increase per year and, in addition, 100% of any tax increase is permitted to be passed through to the tenants. If there is a tax reduction, the tenants are entitled to receive 50% of the net property tax reduction. There is no evidence that the tenants have ever paid a tax increase surcharge.
I conclude that the proper method of arriving at the economic rent for property in a vacancy decontrol transition period, where there is proof of competent management, is to annualize the actual rents as of the assessing date. This approach contemplates that the assessor, in each year during the transition period from rent control to free market rentals, would reassess the property based on the changed rentals on each assessing date until the transition is substantially completed.
In view of the fact that the property is fully rented and there is a waiting list, I will use only a 1% vacancy allowance. Decontrolled apartments are being rented at substantially higher rents than controlled apartments. The October 1, 1984 rent roll of $95,515 includes many decontrolled apartments that are rented at less than the highest rental for each apartment type. Some controlled apartment rents are not being increased the *272 permitted 6%.[2] For these reasons, increased vacancies due to rent increases for decontrolled apartments are not anticipated, and a 1% vacancy factor is reasonable.
I accept taxpayer’s operating expense figures, which are based on four years’ experience, and with the exception of the maintenance and repairs figure referred to previously, are very similar to the figures used by the taxing district’s expert.
Taxpayer’s expert’s capitalization rate is based on a mortgage equity analysis in which the expert uses an October 1, 1984 mortgage interest rate of 13% and a mortgage constant of 13.53%. This expert also provides for an equity return of 10%. However, the insurance council statistics which he has provided show capitalization rates for non-elevator apartments for the year 1984 to be 10.6% and, for the fourth quarter of 1984, to be 10.2%. The capitalization rate for New Jersey for the fourth quarter of 1984 is shown as 10.7% for multi-family and non-residential properties. It was the opinion of the expert for the taxing district that an overall capitalization rate of 11.5% was appropriate.
I find that an overall capitalization rate is more reflective of the market as it existed on the assessing date. Substantial fluctuations in mortgage interest rates during the period have resulted in variations in equity return rates, with investors being willing to accept lower equity returns if mortgages are available only at high interest rates. This accounts for an overall capitalization rate of 10-11% during a period when mortgage interest rates exceeded this figure.
I find that the taxing district’s capitalization rate of 11.5% is appropriate for the subject property, even though it may be higher than capitalization rates existing in the market as of the assessing date, as indicated by taxpayer’s insurance council capitalization rate studies, which are confirmed by the *273 taxing district’s garden apartment sale at an 11% overall rate in June 1985. This sale, although occurring after the October 1, 1984 assessing date, is current enough to be indicative of the market. A slightly higher capitalization rate of 11.5% is justifiable at this stage of the rent decontrol transition period.
The taxing district’s expert’s cost and market approaches tend to support the fact that taxpayer’s valuation is too low. I do not accept taxpayer’s argument that the land should be valued at $50,000 an acre. Instead, land sold for multi-family residential use is valued in the market by the number of units that can be constructed on the land. Even if the taxing district’s cost approach land value were reduced to $7,000 per unit, a modest figure, the taxing district’s cost approach value[3] would indicate that taxpayer’s $4,150,000 value is conservative.
I conclude that the October 1, 1984 value of the subject property is $4,644,000 (rounded). This value reflects the uncertainties of the transition from full rent control to free market rents, the absence of testimony of comparable rents and the time period necessary to obtain full decontrol. In addition, there has been no evidence of the effect of the pass through to tenants of local property tax increases.
 The $4,644,000 value exceeds the 1985 assessment of $4,494,000. Taxpayer has argued that the true value figure should be reduced to reflect the common level ratio of 94.94%, even though the assessment is within the corridor created by N.J.S.A. 54:51A-6. The lower limit of this corridor is 80.70% and the upper limit, although 109.18%, becomes 100% pursuant to N.J.S.A. 54:51A-6b. There is no support for taxpayer’s argument that the corridor should be ignored in the case of a substantial increase in the assessment three years after the revaluation year. There is no proof that on October 1, 1984 all of the assessments in the taxing district were uniform, nor is there any proof that by increasing the subject assessment, the *274 assessor upset any uniformity that may have existed. The remedy provided by the Legislature for taxpayer relief from discrimination is limited by a corridor, the common level range. If the assessment is within the corridor, the taxpayer is not entitled to relief unless it can be shown that the assessment is “virtually confiscatory.” Murnick v. Asbury Park, 95 N.J. 452, 463, 471 A.2d 1196 (1984), citing 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J.Tax 206, 216 (Tax Ct.1981).
It is the obligation of the assessor to annually assess all real property in a taxing district at its taxable value. N.J.S.A. 54:4-23. He must annually revise and improve the quality of his assessments, and revisions should be made when, in the assessor’s opinion, changes in value so dictate. In the subject case, there has been an obvious change in the value of the property since the 1982 assessment (as reduced by settlement). It is the duty of the assessor to revise the assessment to reflect this change in value. Cf. Tall Timbers, Inc. v. Vernon Tp., 5 N.J.Tax 299, 309 (Tax Ct.1983). The 1985 assessment is within the common level range, and therefore it may not be disturbed either by reducing it to the 94.94% figure urged by taxpayer or increasing it to the $4,644,000 true value figure. For this reason, the 1985 assessment of $4,494,000 is affirmed, and the Clerk of the Tax Court is directed to enter a judgment accordingly.

 $2.81 X .9494 = $2.67

 Since there was no contradiction of testimony that the management is competent, I conclude that the lack of uniformity of rents and rent increases is the result of the transition from controlled to decontrolled rent.

 57,000 X 214 units = $1,498,000 land + $3,515,069 improvements = $5,013,069.