571 A.2d 352

LORI ROTH, DONALD LITT, BARBARA EIDELSBERG, DIANE BAUER, DANIEL M. LITT, SHERRY LACKRITZ, FREDERICK LITT, DR. LAWRENCE EDEN, AND JOSEPH E. GASSIB, PLAINTIFFS, v. RUTHERFORD RENT BOARD, ELEANOR BOCKER, AGNES MORRIS, ANNA HUNTER, MARTHA KELLERMAN, FRANCES KASPERSKI, SAMUEL BLOOMFIELD, ELIZABETH CRONIN, CATHERINE ROGERS, ALBERT VAN DER VEEN, MRS. JOHN KILROY, REGINA CUNNINGHAM, ELEANOR NOONAN, THOMAS GRIFFEN, JULIA BUHTANIC, ANGELO DE MARCO, EMILY HANSON, PEARL FECANIN, ALFRED BARBERA, EDWARD NOFF, OLIVE MACINTYRE, ROBERT MACFADDEN, CATHERINE BROWN, GRENVILLE LLOYD, LORETTA DOMMELEERS, GRACE BRODER, LAURA FERUCCI, DAVID MINOR, LILLIAN HEINRICH, JOAN SINK, LILLIAN BRUDER, MRS. JOHN SOLTIS, MRS. MATTHEW ALBONESE, A/K/A JANE ALBONESE, PATRICIA MURPHY, WILLIAM BARRETT, CHRISTINE SUDOL, MARGARET XIGUES, WILLIAM BIDWELL, ELEANOR CINQUEGRAMA, LAU-

RINA DAY, DOROTHY RAABE, LOTTIE MILLER, BETTY BAL-
OGH, GERTRUDE KOHN, MINERVA BLOM, RUTH CLANCY,
MRS. DAVID GREENSTEIN, MARIA SHINE, MR. AND MRS.
PATRICK J. O'BYRNE, DOROTHY HAHN, KAP YI PAK, MAR-
THA DOYLE, LUDMILLA SZAYNA, MR. AND MRS. ARTHUR
HAUCK, DEFENDANTS.

Superior Court of New Jersey
Law Division Bergen County

Decided May 31, 1989.

*Richard G. Berger* (*Schiffman, Berger & Kaufman*, attorneys) and *Daniel M. Litt, pro hac vice* (*Melrod, Redman & Gartlan*, attorneys) for plaintiffs.

*Gary Cucchiara* for defendant Rutherford Rent Board (*Van-Winkle & Cucchiara*, attorneys).

*Howard J. Hoffman* (*Hoffman, Wertalik & Sprague*, attorneys) and *Walter G. Lesnevich*, (*Richard Potter*, attorney) for remaining defendants.

HARRIS, J.S.C.

INTRODUCTION.

This is Chapter Two[1] in the on-going saga among various landlords and their protected tenants[2] arising out of actions by the Rutherford Rent Board ("board") limiting the allowable local property tax surcharge imposed by plaintiffs against defendants. Here, landlords seek a reversal of a decision of the board which permitted a 17% increase in the tax surcharges to be passed through to, and to be paid by, the protected tenants. Plaintiffs claim that the 17% increase is confiscatory, arbitrary,

---

[1]Chapter One was written by Judge Evers in *Litt v. Rutherford Rent Board,* 196 *N.J.Super.* 456, 483 *A.2d* 239 (Law Div.1984).

[2]See Senior Citizen and Disabled Protected Tenancy Act, *N.J.S.A.* 2A:18–61.22 *et seq.*

capricious, unreasonable, and contrary to the local rent-control ordinance.

The precipitating event which triggered this action was the implementation of the 1988 local property tax revaluation by the Rutherford tax assessor. This resulted in an increase in the plaintiffs' local property tax liability ranging from 55% to 145%. Plaintiffs were prepared to pass these increases along to their tenants in accordance with the local ordinance until thwarted by the decision of the board in the Summer of 1988. This action in lieu of prerogative writs was initiated to overturn the board's action and to declare the amount and manner of calculating allowable tax surcharges following Rutherford's first revaluation since *Litt v. Rutherford Rent Board*, 196 *N.J.Super.* 456, 483 *A.*2d 239 (Law Div.1984).

PROCEDURAL POSTURE OF THE ACTION.

As a result of *Litt, supra,* landlords in Rutherford were obligated, pursuant to section 83A–7(A) of the Rutherford rent-control ordinance, to eliminate from their tax surcharge computations, all local property taxes imposed as a result of a conversion from rental to condominium or cooperative ownership. For plaintiffs, this meant that in each post-conversion year, the board gradually increased the allowable tax surcharge based upon the formula validated by Judge Evers: multiply the current year's tax rate by the assessment of the year prior to the conversion.

The board acted "informally" in each post-conversion year— not as a result of either a formal application by a landlord or an appeal by a tenant—and set the allowable surcharge, which has not been heretofore contested until the instant action.

In July 1988, apparently as a result of informal complaints by some defendants, the board conducted a hearing to inquire as to the appropriate tax surcharge for 1988. As a result of the revaluation, the old formula of multiplying the 1988 tax rate by the pre-conversion assessment was obviously of little utility. At the hearing, two "experts" testified and gave entirely incon-

clusive testimony regarding the amount of taxes owed by plaintiffs which were attributable to the conversion of the properties. Other witnesses testified, including some of the parties to the instant action, but the board was frustrated in its attempt to clearly quantify the amount of taxes solely attributable to the conversions.

Instead, under the guise of making "policy" the board acted in what can most charitably be characterized as an "equitable mode," and set the allowable tax surcharge at 17% of plaintiffs' increase, which percentage represented the percentage increase in Rutherford's local property tax requirement between 1988 and 1987.

Plaintiffs commenced this action in August 1988. A trial based upon stipulated facts was conducted on May 17, 1989. No live testimony was presented, although both parties were given the opportunity to produce witnesses [3].

FINDINGS OF FACT.

Plaintiffs are the owners of residential rental units in the Borough of Rutherford. Some own shares in a cooperative apartment corporation known as Hastings Village, Inc. and one owns nine condominium units in a condominium regime located at 155 Union Avenue. All of these units are rented to tenants who have been accorded protected status pursuant to the Senior

---

[3]The pretrial order permitted live testimony. However, the court required the parties to advise the court approximately 60 days prior to trial if, in fact, live testimony would be presented. All parties declined to produce witnesses and instead relied upon an agreed-to list of stipulated facts and documents supporting such facts. The transcript of the July 28, 1988 hearing before the board was made part of the record and considered by the court, as was the local rent-control ordinance. After the conclusion of the trial, plaintiffs attempted to informally offer additional facts and formulae which were not the subject of the stipulation and which the court finds may not be directly gleaned form the stipulation. The court rejected the proffer, but invites the parties to seek formal relief under either *R.* 4:49–2 or *R.* 4:50–1 if they believe that an amendment to the court's decision is in order.

Citizens and Disabled Protected Tenancy Act, *N.J.S.A.* 2A:18–61.22 *et seq.*

In 1983, as a result of the decision of Judge Evers in *Litt, supra,* the board was sustained in precluding landlords in Rutherford from including within their otherwise permitted tax surcharges to tenants that portion of the taxes which represented a "cost" of their conversion from a pure rental form of ownership to a cooperative form of ownership. The cooperative apartment complex involved in the instant litigation was the subject of *Litt, supra.*

The operation of the Rutherford rent-control ordinance allows a landlord to impose and collect an annual tax surcharge from its tenants based upon a simple formula:

Annual tax surcharge per room = (present property tax minus 1973 property tax) divided by number of rented rooms.

This simple formula was altered by the decision in *Litt, supra,* where landlords were precluded from including in the "present property tax" any amount that represented "conversion costs." Unfortunately, neither the board nor Judge Evers made an independent finding of the amount of the 1983 taxes which was *solely* attributable to the conversion, yet a review of the undisputed facts reveals that such component was readily ascertainable. The board, however, after 1983, chose not to distill the "conversion costs" from the 1983 taxes, and instead used the expedient method of simply multiplying the current tax rate by the pre-conversion assessment as part of the determination of the permissible tax increase for each year after the year of conversion. When 1988 arrived, however, the board was confronted with the conundrum of applying a substantially lower tax rate for 1988—a result of the 1988 district-wide revaluation—against the pre-conversion assessment. If the board had continued this method, the Hastings Village plaintiffs would be entitled to no tax surcharge whatsoever for 1988, notwithstanding that the tax burden for the entire cooperative in 1988

increased by approximately 55% from $332,846.11 to $516,-275.38.

Plaintiffs apparently decided not to await the annual ritual and informal redetermination of allowable tax surcharges and advised their tenants pursuant to the Rutherford rent-control ordinance of the impending tax surcharge based simply upon the arithmetical application of the section 83A-7(A) formula. Although the record is far from clear, it appears that the board took the unprecedented step of reacting to tenant complaints by conducting an "investigatory" hearing on July 28, 1988 for the purpose of setting the 1988 tax surcharge upon plaintiffs.

The board produced two witnesses, both expert appraisers, and sought to elicit information from which the board could distill a discrete component out of the 1988 taxes which was attributable to the conversion, and which could be deemed "conversion costs."[4] A review of the record reveals the near impossibility of such a search and the candid admissions by the experts reveal that such an analysis was not only infeasible, but virtually nonsensical. Appraisal science (some might say artistry, others call it alchemy) could not provide the board with the objective data which it was seeking. Nevertheless, a clear "feeling" on the part of the board emerged from the hearing, and which was expressed at trial, that although the board could not quantify the "conversion costs" in the 1988 taxes, it nevertheless sensed that some conversion cost was embedded in the 1988 taxes. Without the objective data it sought, the board applied an equitable policy to cap the tax surcharge at 17% which reflected the overall percentage increase in taxes in Rutherford between 1987 and 1988.

---

[4]The court finds that notwithstanding the board's claim that it was searching for the truth of the situation, this is belied by the board's refusal to allow the experts to be cross-examined or otherwise questioned by anyone other than board members.

## HASTINGS VILLAGE.

In 1982 the total local property tax burden of the owner of Hastings Village was $122,289.81 [5]. As a result of the conversion, the 1983 taxes, after a successful tax appeal, were $245,-338.65. This translated into an *increase* of $9.38 a room a month. *Litt, supra* at 459, 483 *A.*2d 239. Plaintiffs suggest that the disallowed "conversion costs" are $123,049.65, which is the arithmetical difference between the 1982 taxes and the 1983 taxes. This can not be the case, however, because the actual disallowed "conversion costs" were computed by applying the 1983 tax rate to the 1982 assessment. *Ibid.* The tax generated by that product must be deducted from the actual 1983 taxes to reveal the actual disallowance:

| | | |
|---|---|---|
| Step 1: | Determine 1982 Taxes: | $ 122,289.81 |
| Step 2: | Determine 1982 Tax Rate: | $ 3.67 [6] |
| Step 3: | Determine 1982 Tax Assessment: | $3,332,125.30 [7] |
| Step 4: | Determine 1983 Tax Rate: | $ 3.93 [8] |
| Step 5: | Determine 1983 Tax pursuant to formula validated by Judge Evers in *Litt, supra*: | $ 130,952.52 [9] |
| Step 6: | Determine actual 1983 Taxes: | $ 245,338.65 |
| Step 7: | Determine Disallowed Tax ("cost of conversion"): | $ 114,386.13 [10] |

As a further example of the jumble of figures here, plaintiffs suggest that the board allowed $0.35 per room per month for

---

[5]The parties submitted a document entitled "Stipulated Facts for Trial" which contains a letter dated January 18, 1989 from the Rutherford tax collector which indicates that the 1982 taxes for Hastings Village were $8,335.53. This is clearly erroneous in light of the fact finding in *Litt, supra,* at 459, 483 *A.*2d 239. However, the "Stipulated Facts for Trial" does denote, in paragraph 5, that the actual taxes for Hastings Village for 1982 were $122,289.

[6]See New Jersey Lawyer's Manual (1982 ed.) at 835.

[7]The assessment is the quotient produced by dividing the taxes ($122,289.00) by the tax rate (.0367).

[8]See New Jersey Lawyer's Manual (1983 ed.) at 857.

[9]The tax is the product of the assessment ($3,332,125.30) multiplied by the tax rate (.0393).

[10]The "cost of conversion" is the difference between step 6 (actual 1983 taxes) and step 5 (1983 taxes adjusted for conversion component as validated by Judge Evers, in *Litt, supra* ).

the 1983 year as a result of *Litt, supra.* That amount was not the subject of a stipulation among the parties, and it makes no sense in light of the facts which *were* stipulated. If the board allowed an increase of $0.35 per room per month in 1983, it would necessarily have found an increase between the 1982 taxes and the 1983 adjusted taxes to be $4,586.40 [11], instead of the amount of $8,663.52 [12] which is arithmetically compelled by the stipulation. The court finds that the only competent evidence is that contained in the stipulation, and not in plaintiffs' brief.

## 155 UNION AVENUE.

The facts regarding 155 Union Avenue are somewhat more difficult to ascertain. Unlike Hastings Village, 155 Union Avenue is a condominium in which a number of units have been sold and for which making a per room calculation requires extrapolation.

In 1982, 155 Union Avenue converted from rental ownership to a condominium regime. The taxes in 1981, prior to the conversion, were $16,907.69 for a development that consisted of 136 rooms. After the conversion, the tax on the properties owned by plaintiff Gassib (the only party-landlord at 155 Union Avenue) has been stipulated to be $10,522.56 (representing Gassib's 29.5 rooms). There was no evidence before the board,

---

[11] The total tax increase is calculated by multiplying the tax per room per month ($0.35) times 12 (months) times the number of rooms agreed upon in the stipulation (1092).

[12] Step 5 minus step 1.

and none presented to the court (other than arguments in plaintiffs' Brief), as to the measure of "conversion costs" which were disallowed to Gassib in the year of conversion. Moreover, Gassib was not a party in *Litt, supra,* and no independent proof was submitted to show how his units were treated by the board. Although *Litt, supra,* appears to have been certified as a class action, *id.* at 458, Gassib clearly was not a member of the class since he was a condominium owner, not a shareholder in Hastings Village. Nevertheless, by employing the same principles used above in the Hastings Village situation, the disallowance is computed as follows:

| Step 1: | Determine 1981 Taxes: | $ | 3,667.48 [13] |
|---------|-----------------------|---|---------------|
| Step 2: | Determine 1981 Tax Rate: | $ | 3.43 [14] |
| Step 3: | Determine 1981 Tax Assessment: | $ | 106,923.61 [15] |
| Step 4: | Determine 1982 Tax Rate: | $ | 3.67 [16] |
| Step 5: | Determine 1982 Tax pursuant to formula validated by Judge Evers in *Litt, supra*: | $ | 3,924.09 [17] |
| Step 6: | Determine actual 1982 Taxes: | $ | 10,522.56 |
| Step 7: | Determine Disallowed Tax ("cost of conversion"): | $ | 6,598.47 [18] |

---

[13]$16,907.69 divided by 136 rooms times 29.5 rooms.

[14]See New Jersey Lawyer's Manual (1981 ed.) at 839.

[15]The assessment for the 29.5 rooms is the quotient produced by dividing the taxes ($3,667.48) by the tax rate (.0343). The court recognizes that from a purist standpoint this methodology is quite ragged. Each condominium unit should be treated as a separate tax line item, but this is not feasible because prior to the conversion each unit was not separately assessed. Thus, a parallax relationship is impossible.

[16]See New Jersey Lawyer's Manual (1982 ed.) at 835.

[17]The tax is the product of the 1981 assessment ($106,923.61) multiplied by the 1982 tax rate (.0367).

[18]The "cost of conversion" is the difference between step 6 (actual 1982 taxes) and step 5 (1982 taxes adjusted for conversion component as validated by Judge Evers, in *Litt, supra* ).

The 1988 taxes attributable to Gassib's units have been stipulated to be $21,250.88.

CONCLUSIONS OF LAW.

New Jersey regulates its rental housing stock through a comprehensive legislative scheme of state and local regulations. The interplay of those regulations is perhaps no better viewed than in *Litt, supra.*

In reviewing the action of the board, the court is limited to an examination of the record below. *Kempner v. Edison Tp.* 54 *N.J.Super.* 408, 149 *A.*2d 251 (App.Div.1959); *Green Acres of Verona, Inc. v. Verona,* 146 *N.J.Super.* 468, 370 *A.*2d 53 (App.Div.1977). In this reexamination the court ought not to substitute its discretion for that of the board, nor does it have the power to do so. *Kramer v. Sea Girt Bd. of Adj.,* 45 *N.J.* 268, 212 *A.*2d 153 (1965); *Ward v. Scott,* 16 *N.J.* 16, 105 *A.*2d 851 (1954). Apart from judicial restraint, the action of the board is presumptively valid and the burden is on plaintiffs to show otherwise. *Brandt v. Mt. Holly Bd. of Adj.,* 16 *N.J.Super.* 113, 84 *A.*2d 18 (App.Div.1951). This can only be done by showing that the action taken was arbitrary, capricious, and unreasonable. *Kramer, supra* 45 *N.J.* at 296, 212 *A.*2d 153; *Ward, supra* 16 N.J. at 21, 105 A.2d 851.

■ While the actions of the board are presumed correct and will withstand judicial interference in the absence of a showing that they are arbitrary, capricious, and unreasonable, the determination must nevertheless be capable of standing against judicial review. *App. of Howard Savings Insti. of Newark,* 32 *N.J.* 29, 159 *A.*2d 113 (1960). It is not sufficient for the board

to merely set forth its conclusions; it must articulate the basis for arriving at those ultimate conclusions and make the factual findings upon which those conclusions rely. It is of more than passing interest that the board did not reduce its decision to a written resolution; at least none was submitted to the court in support of its actions.

■ Where the record is insufficient to permit proper review, the appropriate action is ordinarily to remand for a proper hearing or adoption of a memorializing resolution. *Kotlarich v. Ramsey*, 51 *N.J.Super.* 520, 144 *A.*2d 279 (App.Div.1958); *Yellow Cab Corp. v. City Council, Passaic*, 124 *N.J.Super.* 570, 308 *A.*2d 60 (Law Div.1973); *DiMaria v. P.E.R.S.*, 225 *N.J.Super.* 341, 542 *A.*2d 498 (App.Div.1988). In the instant matter the board utterly failed to articulate in a formal manner the rationale for its 17% limitation. Although its reasons may be gleaned from the entirety of the record, the board should ordinarily be given an opportunity to amplify and expand the reasons for its decision.

Here, however, plaintiffs have suffered at the hands of a runaway board. It has exceeded its powers in a procedural milieu that subjected plaintiffs involuntarily to an adversarial hearing where the purpose was unclear, the rules for determination unstated, and the burden of proof mysteriously cast upon landlords without fair notice. Moreover, the judicial decision to be made here is purely a legal one since it involves the interpretation of an ordinance. It is a decision which neither calls for the exercise of discretion by the board, nor calls into play the recognized expertise of the board in matters of local interest and concern. As such, the usual deference paid to the decisions of local administrative agencies may be suspended.

*See Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 312 *A.*2d 497 (1973); *Grancagnola v. Planning Bd. of Verona,* 221 *N.J.Super.* 71, 533 *A.*2d 982 (App.Div.1987).

A local administrative agency has discretion to exercise its statutory authority by adjudication or rulemaking, and agencies enjoy a great deal of flexibility in selecting the proceedings most likely to achieve their regulatory aims. *State, Dept. of Envir. Prot. v. Stavola,* 103 *N.J.* 425, 511 *A.*2d 622 (1986). As an alternative to acting formally through rulemaking or adjudication, administrative agencies may act informally. *Texter v. Human Serv. Dept.,* 88 *N.J.* 376, 443 *A.*2d 178 (1982); *In re Solid Waste Util. Cust. Lists,* 106 *N.J.* 508, 524 *A.*2d 386 (1987). The various kinds of action can overlap, and the line between agency rulemaking and adjudication, on the one hand, and informal action, on the other, can become blurred. However, what all three modes of action have in common is the enabling legislation which permits such activity.

For example, the Board of Public Utilities is delegated power to conduct wide-ranging investigations concerning any public utility under *N.J.S.A.* 48:2–19a; the Commissioner of Transportation is broadly empowered to approve the installation of traffic signals, *N.J.S.A.* 39:4–120; and the Commissioner of Environmental Protection is vested with power to administer the Coastal Area Facilities Review Act, *N.J.S.A.* 13:19–16. In each example, investigatory powers are available to each agency because the enabling legislation is clear and unambiguous in providing such a grant of power.

The board, on the other hand, has no such express power. The Rutherford rent-control ordinance is a bare-boned outline giving the board explicit powers and reserving to the locally elected governing body all policy matters regarding the

ordinance's implementation. The board suggests that the language of *Litt, supra,* vests it with the power and authority to make the type of decision it made here. However, it is entirely unclear exactly how the board obtained jurisdiction in 1983 to make the decision upon which *Litt, supra,* was determined. Based upon the Rutherford rent-control ordinance itself, the board has no power to initiate an investigation. It may only react, when confronted by a formal complaint. Even then, it is doubtful whether, under this particular ordinance, the board has authority to adjust controversies between landlords and tenants on issues other than rent. Local property taxes, under the Rutherford rent-control ordinance, are not rent. Thus, the board's action in this matter was *ultra vires* and invalid.

This conclusion is reached notwithstanding the long-held rule that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and courts will readily imply such incidental powers as are necessary to fully effectuate the legislative intent. *Dept. of Labor v. Titan Constr. Co.,* 102 *N.J.* 1, 504 *A.*2d 7 (1985). The board here was not in a position to initiate a proceeding which would lead to the ultimate determination of private rights. This mode of agency action is clearly adjudicatory, and not rulemaking or informal action [19]. Adjudicatory proceedings determine the rights and relations of specific individuals or a limited group of individuals. These determinations often involve disputed factual issues and require evidence and cross-examination for proper resolution. *Cf. Cedar Grove v. Sheridan,* 209 *N.J.Super.* 267, 507 *A.*2d 304 (App.Div.1986). Here, although the board recognized that there were disputed factual issues, it conducted the "hearing" as if it were an *ex parte* investigation. Since the proper search should have been whether *any* amount of the 1988 local property taxes were *solely* attributable to the conversion, the board

---

[19]The board's actions in the post-conversion years also appear unauthorized as they were concededly done on an "informal basis."

was obligated to assume the role of the neutral judicial observer and trier of the facts. It had no business leading the charge on behalf of tenants.

Moreover, given the structure of the Rutherford rent-control ordinance, which permits landlords in the first instance to impose the tax surcharge, the contested case would necessarily have been initiated by an aggrieved tenant who would thereafter have had the burden of proving which component of the 1988 local property taxes were solely the result of the conversion. See *Marine View Housing Co. No. 1 v. Benoit*, 188 *N.J.Super.* 539, 457 *A*.2d 1241 (Law Div.1982) (tenant has burden of proof to establish unconscionability of landlord's rent increase under the Anti–Eviction Act, *N.J.S.A.* 2A:18–61.1 *et seq.*). The landlords should neither have been subjected to a phantom burden of proof required by the board, nor obligated to participate in a wholly unauthorized *quasi*-judicial exercise. The board acted arbitrarily, capriciously, and unreasonably at almost every turn in this matter. Its decision is flawed, not only because of these procedural deficiencies, but also as a matter of law on the merits of the amount of the allowable tax surcharge.

It is well established that municipalities need not rely upon a housing emergency to implement rent control; instead, in the exercise of their *police powers*, they may enact rent control ordinances. *AMN, Inc. v. So. Bruns. Tp. Rent Leveling Bd.*, 93 *N.J.* 518, 461 *A*.2d 1138 (1983); *Harry's Village, Inc. v. Egg Harbor Tp.*, 89 *N.J.* 576, 446 *A*.2d 862 (1982); *Helmsley v. Borough of Fort Lee*, 78 *N.J.* 200, 394 *A*.2d 65 (1978), app. dism. 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979); *Brunetti v. Borough of New Milford*, 68 *N.J.* 576, 350 *A*.2d 19 (1975); *Inganamort v. Borough of Fort Lee*, 62 *N.J.* 521, 303 *A*.2d 298 (1973).

A municipality has the power to permit or not a tax surcharge (sometimes denominated as a "tax passthrough") to be obtained from tenants and the failure to make such provision

is not fatal so long as the entire rent-leveling ordinance meets the constitutional test of providing a fair and reasonable return. *Kim Real Estate Ent. v. North Bergen Tp.*, 215 *N.J.Super.* 255, 521 *A.*2d 900 (App.Div.1987); *Dome Realty, Inc. v. Paterson*, 150 *N.J.Super.* 448, 375 *A.*2d 1240 (App.Div.1977). Constitutional provisions do not require that rent-control ordinances allow landlords to recover all increases in their operating expenses. *Brunetti, supra* 68 *N.J.* at 597–598, 350 *A.*2d 19. The regulatory scheme is not required to take a particular predetermined form, so long as the scheme is not wholly arbitrary and unreasonable. *Hutton Park Gardens v. West Orange Town Council*, 68 *N.J.* 543, 350 *A.*2d 1 (1975). It need only permit the efficient landlord to enjoy a "just and reasonable" return on its property. *Parks v. Hazlet Tp. Rent Control Board*, 107 *N.J.* 217, 526 *A.*2d 685 (1987); *Mayes v. Jackson Tp. Rent Leveling Board*, 103 *N.J.* 362, 511 *A.*2d 589 (1986), *cert.* den. 479 *U.S.* 1090, 107 *S.Ct.* 1300, 94 *L.Ed.*2d 155 (1987).

On the other hand, if an ordinance permits such a tax surcharge, it must be accomplished by means which are rationally related to the overall purpose of the rent-control ordinance and in harmony with state legislation on the subject matter. The board claims that its 17% limitation on plaintiffs' proposed tax surcharge is in compliance with *N.J.S.A.* 2A:18–61.31 and *Litt, supra*, since by this limitation, the tenants will not be burdened with proscribed costs attributable to conversion activity. The court disagrees and determines that the 17% limitation is not only devoid of any rational basis related to the tax burden of plaintiffs, but that it flies in the face of the plain language of the rent-control ordinance.

Section 83A–7(A) provides:

At the expiration or termination of a lease or month to month tenancy, the landlord may seek a tax surcharge from the tenant because of an increase in municipal property taxes. The tax surcharge shall not exceed that amount authorized by the following provisions. The landlord shall divide the increase in the present property tax over the property tax of the base year 1973 by the number of rented rooms in the multiple dwelling to obtain the tax increase per

room. The tenant shall not be liable for a tax surcharge exceeding the tax increase per room multiplied by the number of rooms occupied by the tenant.

Taxes are not rent. Section 83A-1(A); sections 83A-7(D). Tax surcharges may be unilaterally imposed and implemented by landlords without permission of the board and without notice to the board. Notice is only required to be provided to affected tenants. Section 83A-7(B).[20]

In construing a municipal ordinance, the court applies the same rules of construction as are applied to statutes. *AMN, Inc., supra; Matlack v. Burlington Cty. Bd. of Chos., Freeholders,* 194 *N.J.Super.* 359, 476 *A.*2d 1262 (App.Div.), certif. den. 99 *N.J.* 191, 491 *A.*2d 693 (1984). Courts must refrain from usurping the legislative body when its intent is clearly expressed. *Tewksbury Tp. v. Jersey Central Power & Light,* 159 *N.J.Super.* 44, 386 *A.*2d 1348 (App.Div.1978), aff'd o.b. 79 *N.J.* 398, 400 *A.*2d 60 (1979). When the language of the ordinance is clear and unambiguous on its face, the court need not look beyond the literal dictates of the words to divine the legislative intent. *State v. Butler,* 89 *N.J.* 220, 445 *A.*2d 399 (1982); *Watt v. Mayor and Council of Borough of Franklin,* 21 *N.J.* 274, 121 *A.*2d 499 (1956). If the legislative wording is precise and free from ambiguity, it is the Court's duty to construe and apply the legislation as enacted. *In re Jamesburg High School Closing,* 83 *N.J.* 540, 416 *A.*2d 896 (1980). The Court may not presume that the legislative body intended something other than what it expressed by its plain language.

In *Litt, supra,* Judge Evers recognized the plain, simple, and unambiguous language of Section 83A-7(A): "A literal application of that provision without *more,* supports landlords' argument." 196 *N.J.Super.* at 462, 483 *A.*2d 239; emphasis supplied.

Judge Evers supplied the "more" by engrafting the philosophy of the Senior Citizen and Disabled Protected Tenancy Act upon

---

[20]Compare section 83A-1(B) which requires a landlord to notify tenants *and* the board of the landlord's intention to seek an increase in *rent.*

the local ordinance. This had the effect of torturing section 83A–7(A) so that a portion of the 1983 tax increase, found by Judge Evers to be a "cost" of conversion, was removed from the computation of allowable tax surcharge. *Id.* at 467. With the conversion activity of 1982 fading into history, the board nevertheless robotically applied the formula approved by Judge Evers without a thought as to the effect of that decision and how it could possibly be applied fairly in a revaluation year [21].

The board's treatment of tax surcharges in post-conversion years has been grossly unfair to plaintiffs. By applying the current tax rate to the pre-conversion assessment for each post-conversion year, the board has deprived plaintiffs of significant revenue and given tenants an enormous deferral of otherwise due payments. A landlord ought not be required to subsidize its tenants to the detriment of itself. *Cromwell Assoc. v. Mayor & Council,* 211 *N.J.Super.* 462, 471, 511 *A.*2d 1273 (Law Div.1985); *see also Property Owners Assn. of N. Bergen v. Tp. of N. Bergen,* 74 *N.J.* 327, 378 *A.*2d 25 (1977).

The board's treatment was made possible and facilitated by the bureaucratic inertia of the local tax assessor who did not conduct annual revaluations. This institutional scorn for *N.J. S.A.* 54:4–23 resulted in a double whammy suffered by landlords here. They not only were singled out for disparate treatment in 1982 and 1983 when their conversions occurred, but they were further made to suffer in each post-conversion

---

[21]The use of special formula or techniques to achieve equality and fairness in revaluation years is not unprecedented. For example, the so-called "page 8" formula has long been a fixture in equalization cases. *See Tp. of Willingboro v. Burlington Cty. Bd. of Tax,* 62 *N.J.* 203, 300 *A.*2d 129 (1973). In the instant case, however, the board's solution to the perceived problem was to take an expedient shortcut, which, although it boasts of administrative ease, is utterly and completely inappropriate in light of the ordinance and common sense. The Rutherford rent-control ordinance grants landlords a full tax surcharge, related only to the landlord's tax situation. The general rise or fall of taxes district-wide bears no necessary relationship to a landlord's tax burden, especially following a revaluation.

year when the rest of the municipal tax line items were not brought up to true value by means of a revaluation.

*N.J.S.A.* 54:4–23 imposes a duty upon the assessor to review assessments annually and to revise them in light of changed valuation factors affecting individual properties. *Tri–Terminal Corp. v. Edgewater,* 68 *N.J.* 405, 346 *A.*2d 396 (1975), *cert.* den., 425 *U.S.* 958, 96 *S.Ct.* 1739, 48 *L.Ed.*2d 203 (1976). The court well-recognizes the unfortunate practicalities which preclude most assessors from reviewing every assessment line item every year. Sometimes this is the result of simple laziness; other times it is the result of budgetary constraints; and sometimes it is the result of political lobbying which seeks to defer the inevitable tax shifting of a district-wide revaluation until someone else's reelection year.

On the other hand, the court is aware that notwithstanding an inability or lack of desire to carry out the constitutional and statutory direction to achieve tax uniformity, assessors must be alert to changed valuation factors between revaluations and make prompt revisions of such assessments in fairness to the taxpayer or taxing district. *See Berkley Arms Apt. Corp. v. Hackensack,* 6 *N.J.Tax* 260 (Tax Ct.1983); *Frieman v. Randolph Tp.,* 8 *N.J.Tax* 264 (Tax Ct.1986), aff'd 216 *N.J.Super.* 507, 524 *A.*2d 453 (App.Div.1987), app. dism. 110 *N.J.* 294, 540 *A.*2d 1276 (1988); *Tall Timbers, Inc. v. Vernon Tp.,* 5 *N.J.Tax* 299 (Tax Ct.1983); *Sage v. Bernards Tp.,* 5 *N.J.Tax* 52 (Tax Ct.1982).

In Rutherford, the assessor failed to conduct a revaluation for at least five years following the conversion of plaintiffs' properties, notwithstanding that their conversions attracted the assessor's attention by impelling increased assessments. The general rising tide of real property values in Bergen County, and in Rutherford in particular (as evidenced by the 1988 assessments of plaintiffs' properties), did nothing to move the

assessor to follow the law.[22]

This unfairness was compounded by the stifling formula employed by the board which ignored the current assessments of plaintiffs' properties and which factored out substantial inflationary influences which the landlords were forced to bear, and from which the tenants have received a windfall. For each post-conversion year the landlords were deprived of over half of the tax surcharges to which they were properly entitled. Even if Judge Evers were correct in excising a portion of the conversion year taxes from the tax surcharge, the board should have distilled the *exact* amount of that excision and deducted it for each subsequent year, rather than mindlessly reapplying the conversion-year formula validated by Judge Evers.

Another problem with the board's approach is its failure to recognize the difficult nature of the issue which it attempted to tackle. Conversion costs for 1983, as to Hastings Village, had already been removed from the tax surcharge formula by Judge Evers. The board, thereafter, embarked upon a search for additional conversion costs which it contends lie embedded somewhere within the 1988 revaluation assessment. The folly of such a search is no better revealed than by an analysis of the assessment process in such a situation and its inherent weaknesses in dealing with convertible properties.

Although impressed with the imprimatur of Judge Evers, the board's determination that conversion costs were created by the 1983 assessment of Hastings Village is subject to serious

---

[22]Plaintiffs could have attempted to ameliorate their economic discomfort by seeking to compel the assessor to conduct a revaluation in an action couched in the principles of *Switz v. Middletown Twp.*, 23 *N.J.* 580, 130 *A.2d* 15 (1957) and *Ridgefield Park v. Bergen Cty Bd of Taxation*, 31 *N.J.* 420, 157 *A.2d* 829 (1960). *But see Berkley Arms Apt. Corp. v. Hackensack*, 7 *N.J.Tax* 457 (Tax Ct.1985).

question. The true value of that property did not magically double between October 1, 1981 [23] and the next October 1. Although it may not be the subject of quantitative proof, Hastings Village, by its very nature, was capable of being converted to a cooperative prior to 1982. As such, it enjoyed a "conversion value potential" which could have been distilled into an increased assessment before the actual transfer of ownership to the cooperative corporation. *See Americana Associates v. Bor. of Fort Lee*, 202 *N.J.Super.* 92, 493 *A.*2d 1306 (App.Div.1985); *Little Ferry v. Vecchiotti*, 7 *N.J.Tax* 389 (Tax Ct.1985) (opinion of Evers, J.T.C.); *Center Whiteman Corp. v. Fort Lee*, 4 *N.J.Tax* 153 (Tax Ct.1982).

Suppose the Rutherford assessor had been astute or imaginative enough to recognize the value potential of Hastings Village in 1980 or 1981 and increased the assessment to account for this potential? Judge Evers and the board would have been hard pressed in that situation to have found that the tax increase was "solely the result of the conversion" (*N.J.S.A.* 2A:18–61.31). Alternatively, if such value potential were inserted in the assessment and the property *never* converted, the increased taxes could not be fairly said to be "solely the result of the conversion." Of course, if the property never converted, there would be no protected tenants, but these same individuals would be paying a substantially increased tax surcharge created by the inherent value of the building, and not by the accident of its ownership. Is this what the Legislature intended? The court thinks not; but *Litt, supra,* is already decided and the court will not retrace that path to a different end.

The fact that the Rutherford assessor neglected to apply this theory of valuation should not be determinative. Tax surcharge computations should not rise or fall based upon whether

---

[23]*See N.J.S.A.* 54:3–21.

the assessor is creative or exercises initiative. However, tax surcharges should bear some nexus to the landlord's tax burden and must be shrouded in fairness and rationality.

Where a determination has already been made, as here, that tax-generated conversion costs were incurred as a result of identifiable assessment practices, *coupled with an actual conversion*, it becomes an almost unmanageable and insurmountable task to refine *additional* conversion costs. The testimony of the July 28, 1988 hearing confirms this observation. The court does not hold that tax-generated conversion costs after the year of conversion will be disallowed as a matter of law. Rather, such costs must be "shown by quantifying evidence to be of meaningful substance." *Cf. Americana Associates, supra* 202 *N.J.Super.* at 96, 493 *A.*2d 1306. In the instant case the board may be theoretically correct that the 1988 assessments contain intangible, abstract conversion costs. Nevertheless, no one was able to reveal this quantum of costs and to thereafter ignore the clear mandate of section 83A-7(A) was patently erroneous.

Thus, as to Hastings Village in 1988, the correct formula to ascertain the tax surcharge per room per month is the following:

| | | |
|---|---|---:|
| Step 1: | Determine 1988 Taxes: | $ 516,275.38 |
| Step 2: | Determine Disallowed Taxes: | $ 114,386.13 |
| Step 3: | Determine difference between Step 2 and Step 1: | $ 401,889.25 |
| Step 4: | Determine 1973 Taxes: | $ 6,919.50 |
| Step 5: | Determine difference between Step 4 and Step 3: | $ 394,969.75 |
| Step 6: | Determine Number of Rooms: | 1,092 |
| Step 7: | Determine tax per room per year by dividing Step 5 by Step 6: | $ 361.69 |
| Step 8: | Determine Tax Surcharge per room per month by dividing Step 7 by 12: | $ 30.14 |

As to 155 Union Avenue in 1988, the correct formula to ascertain the tax surcharge per room per month is the following:

| | | |
|---|---|---:|
| Step 1: | Determine 1988 Taxes: | $ 21,250.88 |
| Step 2: | Determine Disallowed Taxes: | $ 6,598.47 |
| Step 3: | Determine difference between Step 2 and Step 1: | $ 14,652.41 |
| Step 4: | Determine 1973 Taxes: | $ 2,828.75 [24] |
| Step 5: | Determine difference between Step 4 and Step 3: | $ 11,823.66 |
| Step 6: | Determine Number of Rooms: | 29.5 |
| Step 7: | Determine tax per room per year by dividing Step 5 by Step 6: | $ 400.80 |
| Step 8: | Determine Tax Surcharge per room per month by dividing Step 7 by 12: | $ 33.40 |

 Even though plaintiffs have not previously directly challenged the post-conversion actions of the board, they are not estopped or otherwise precluded from urging that such actions were improper. They may not, on the other hand, be heard to seek retroactive reimbursement or any other pecuniary relief, as they are woefully out of time and no overriding public interest is at stake so as to justify a relaxation of the 45–day time period of *R.* 4:69–6(c).

Nevertheless, for all the sparks and fury presented by the parties regarding whether the plaintiffs are out of time for a recomputation of the 1983 to 1987 surcharges, the plain language of the Rutherford rent-control ordinance controls the operation of the tax surcharge for 1988, regardless of whether the plaintiffs challenged prior years. If these plaintiffs had never imposed a tax surcharge upon their protected tenants because of altruistic or other reasons, they would find themselves in 1988 in exactly the same position that this opinion places them. They would not be disqualified from the benefits of the unambiguous language of section 83A–7(A), except, of course, they would not be entitled to collect retroactively for any years. The circumstance here, where the landlords were prevented from collecting the full measure of their tax surcharge for past years likewise does not disqualify them from the forward-looking provisions of section 83A–7(A), but, again, they are precluded from seeking either a declaration of the specific amounts to which they would have been entitled be-

---

[24]Extrapolated from 1973 taxes on entire development and reduced proportionately for 29.5 rooms.

tween 1983 and 1987, and from actually collecting such improperly withheld tax surcharges. Plaintiffs made an economic choice not to pursue appeals for all past years because the discrete amounts in controversy were diminutive. They may not now be heard to complain about the size of their bank accounts, and these defendants are immunized from any retroactive application of the principles of this opinion.

On the other hand, defendants have reaped substantial economic benefits from the erroneous decisions of the board and the lack of timely action by plaintiffs. If the 1988 tax surcharge seems harsh, it may be ameliorated by the thought that these defendants ran the risk for all these years of paying the higher correct amount of tax surcharges *plus* the tax surcharge imposed here. This decision is not the result of any cost-sharing philosophy or "spread-the-burden" doctrine created by the court. Rather, it is a direct consequence of the expansive and liberal tax surcharge provisions contained in the Rutherford rent-control ordinance itself. If defendants have a grievance that this tax surcharge formula is detrimental to them, they should pursue their complaint with the Rutherford governing body, not with plaintiffs or the board.

CONCLUSION.

Based upon the foregoing it is obvious that the instant actions of the Rutherford Rent Board were grievously arbitrary, capricious, and unreasonable. Its decision setting the 1988 tax surcharge for plaintiffs is set aside and reversed. Plaintiffs may impose the correct 1988 surcharge upon defendants retroactive to July 28, 1988, in accordance with this opinion. Costs shall be assessed against defendants.